UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WELDON P. WILLIAMS #383826** | **CIVIL ACTION** |
| **versus** | **NO. 04-3172** |
| **WARDEN BURL CAIN** | **SECTION: "F" (3)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).[1] Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination. According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Weldon P. Williams, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On March 8, 1997, he was convicted of first degree murder in violation of La.Rev.Stat.Ann § 14:30.[2] On June 27, 1997, he was sentenced to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence, with credit for time served.[3] On December 1, 1999, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4] He then filed with the Louisiana Supreme Court an application for writ of certiorari[5] which was denied on June 16, 2000.[6]

On or about June 5, 2001, petitioner filed with the state district court an application for post-conviction relief.[7] On November 2, 2001, that application was granted and the matter was set for an evidentiary hearing.[8] On June 5, 2003, the state district court held an evidentiary hearing and denied petitioner's application.[9] Petitioner next filed with the Louisiana Fourth Circuit Court of Appeal an application for writs of certiorari, mandamus, and prohibition.[10] On October 20, 2003,

---

[2] State Rec., Vol. III of XIII, minute entry dated March 8, 1997; State Rec., Vol. V of XIII, jury verdict form.

[3] State Rec., Vol. III of XIII, minute entry dated June 27, 1997.

[4] State v. Williams, No. 98-KA-0174 (La. App. 4th Cir. Dec. 1, 1999) (unpublished); State Rec., Vol. VII of XIII.

[5] State Rec., Vol. VII of XIII.

[6] State v. Williams, 764 So.2d 962 (La. 2000) (No. 2000-K-0002); State Rec., Vol. VII of XIII.

[7] State Rec., Vol. IV of XIII. Petitioner signed the application on June 5, 2001.

[8] State Rec., Vol. X of XIII, Judgment dated November 2, 2001.

[9] State Rec., Vol. VI of XIII, transcript of June 5, 2003.

[10] State Rec., Vol. VI of XIII.

the intermediate appellate court granted that application but denied petitioner relief, holding that the state district court did not err in denying the post-conviction application.[11] He then filed with the Louisiana Supreme Court an application for writs of certiorari, mandamus and prohibition[12] which was denied on September 3, 2004.[13]

While that application was pending, petitioner returned to the state district court to file a second post-conviction application on March 3, 2004.[14] That application was denied on April 2, 2004.[15] He next filed with the Louisiana Fourth Circuit Court of Appeal an application for a supervisory writ which was denied on June 2, 2004.[16] He then filed with the Louisiana Supreme Court an application for supervisory and/or remedial writs which was denied on April 29, 2005.[17]

Meanwhile, on November 9, 2004, petitioner filed this federal application for *habeas corpus* relief.[18] In support of his application, petitioner claims that his counsel was ineffective in failing to pursue a ruling on his motion to suppress petitioner's identification and in failing to object

---

[11] State v. Williams, No. 2003-K-1740 (La. App. 4th Cir. Oct. 20, 2003); State Rec., Vol. VIII of XIII.

[12] State Rec., Vol. VIII of XIII.

[13] State v. Williams, 882 So.2d 604 (La. 2004) (No. 2003-KP-3077); State Rec., Vol. VIII of XIII.

[14] State Rec., Vol. IX of XIII.

[15] State Rec., Vol. IX of XIII, docket master entry for April 2, 2004.

[16] State v. Williams, No. 2004-K-0648 (La. App. 4th Cir. June 2, 2004) (unpublished); State Rec., Vol. IX of XIII.

[17] State *ex rel.* Williams v. State, 901 So.2d 1060 (La. 2005).

[18] Rec. Doc. 2.

to the identification at trial.  Because the state concedes that petitioner's federal application was timely filed and that he exhausted his state court remedies,[19] this Court will address petitioner's claims on the merits.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of

---

[19]Rec. Doc. 7, pp. 2-5.

> clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Larry Montgomery, a security guard at Dixon Welding, testified that on April 23, 1994, at 1:00 a.m., as he was making the rounds of the isolated facility, he saw a white LeBaron with its headlights on, parked near one of the gates. He saw two men searching the area with flashlights. He described one of the men as a stocky white male. After speaking to them briefly, they got into a car and backed away quickly. He later heard noises and noticed that a door to a trailer had been pried open. He noticed a young black male, who had been shot, inside the trailer and he called the police.
>
> Deputy David Morgan and Captain Chuck Bowles, from Plaquemines Parish, testified that on April 23, 1994 at around 1:00 a.m., they responded to a call. Matthew Morgan of the Plaquemines Parish Sheriff's Office answered the call because the site was on the parish line. They proceeded to the trailer where a voice from the inside said; "I've been shot. Don't shoot anymore." He opened the door to find Willard Storey sitting in a chair. Storey told him that his friend had been shot. Deputy Morgan found the body of Mitchell Ceasar in a nearby field, and notified the New Orleans Police Department.
>
> Captain Charles Bowles of the Plaquemines Parish Sheriff's Office also answered the call. Captain Bowles said that Storey was on the floor of the trailer and told him that a policeman and his brother had shot him.
>
> Officer Peter Cuadrado arrived at the scene and collected one copper jacketed lead pellet, one spent lead pellet, two Winchester brand .38 Super Auto Plus P casings, and two Winchester nine millimeter Luger spent casings.
>
> Detective Carlton Lawless went to the scene during the daytime of April 26, 1994, and found three spent nine millimeter Winchester casings, one spent F-C nine millimeter casing, a spent

copper-jacketed lead pellet, and a set of keys which were later identified as belonging to the victim Mitchell Ceasar.

Officer Gary Marchese spoke to Storey at the hospital and learned that George Gillam was a suspect. Using the name of George Gillam from the juvenile bureau, Officer Marchese found that Gillam's mother's maiden name was Williams and that the defendant Williams lived in he same apartment complex as Gillam. He showed Storey a photographic lineup, and Storey chose a picture of the defendant. Marchese also obtained a taped statement from Storey. Storey said that the defendant had been wearing black police uniform type pants with a gold stripe running down the side and a kind of work belt that a police officer would wear.

Pursuant to a warrant the defendant was arrested. In a taped statement the defendant told the officers that they could find a white Cougar at a body shop. His statement was played for the jury. A search of the defendant's residence revealed elements of the defendant's police uniform, nine-millimeter Black Talon rounds and nine-millimeter ammunition of the kind used by the New Orleans Police Department.

Officer John Treadaway, a firearms examiner, testified that some of the bullets found at the scene were fired from the gun recovered from the defendant at the time of his arrest. He said the Black Talon hollow point bullets recovered from the body of Ceasar were difficult to obtain, but could be purchased by police officers. He could not be sure if the ones recovered in the autopsy were fired from the recovered gun, but they had the same general rifling characteristics. He said the physical evidence suggested that a minimum of two guns were used at the scene.

Officer Melvin Howard testified that the defendant worked for the New Orleans Police Department and that he was the defendant's supervisor. He testified that the type of weapon and ammunition recovered from the defendant's home were common to several New Orleans police officers. He also said that the defendant worked at the Jazz Fest on the Friday of the crime and that he did not work the next day, but did work on Sunday. When Officer Howard questioned him about why he had not shown up for work on Saturday, he told him he had a family emergency, and had to drive his mother to Monroe. He also said that he had asked his wife to call Howard.

Storey's mother, Veronica North, said his nickname was Slugger and that Mitchell Ceasar was like a "foster son" who lived with her. She last saw them at 1:30 a.m. on the Saturday of the crimes.

Storey took the stand and stated that he and his best friend Ceasar were planning to go to talent show at 6:00 p.m. on the night before the crimes, but canceled their plans when they could not get a ride. Furthermore, a woman came to his apartment to return Gillam's phone. Later that night, Gillam knocked on the window and asked if Storey had the phone, but said he would return later to pick it up. Gillam returned 15-20 minutes later and asked Storey and Ceasar to come outside. A white car with black stripes was parked outside with the defendant Weldon Williams allegedly in the driver's seat. He started waiving a gun and told Storey to get in the car. Storey assumed that Gillam "had a gun on" Ceasar. Storey and Ceasar got into the back seat, from the passenger side. Storey remembered that defendant Weldon Williams was wearing dark pants with a stripe on the side. He saw the guns that both the defendant and Gillam were carrying. The witness noted that the defendant and Gillam began commonly referring to their "mama" in a conversation. The defendant drove a distance and they arrived at a dirt road blocked by a wire. He got out of the car, lowered the wire, and drove into a field. He stopped the car, got out and put the utility belt he was wearing in the trunk of the car. The defendant then stuck the gun inside the car, and ordered Storey to get out and lie face down on the ground. Storey complied. Gillam ordered Ceasar to do the same. The defendant then started shooting at Storey. As Storey ran, Gillam shot him. Storey said that he heard Ceasar scream, and then he heard more shots. After the shots stopped, he turned and saw headlights; the car struck him and he fell. Gillam got out of the car and chased Storey until he fell. Gillam stood over him and "played" with his gun, which seemed jammed. Gillam returned to the car and came back with a different gun, looking for Storey, but could not find him. He started calling Storey's name saying that they were going to take him to a hospital. The men then began looking for him with flashlights. Storey crawled into a ditch, but he could still see the men searching for him with flashlights. Storey could hear the defendant, who was carrying a large black flashlight, cursing. A car approached, and the men left.

After the men left, Storey while in the ditch washed the blood off of himself to avoid leaving a blood trail that could be followed. He found a trailer, pried open the door and hid inside. Within twenty minutes, he heard a police officer on a loudspeaker ordering him to come out with his hands up or else dogs would be released. He could not respond because of his injuries. The officers came into the trailer and asked who had shot him, and he responded that "George and his brother." He said he did not know the brother's name although he

> thought he had heard Gillam call him Waylon. He told them that Ceasar was in the field. An ambulance arrived and transported him to Joellen Smith Hospital and then to Charity. He spoke to Officer Marchese at Charity who taped his statement. He described the men and their clothing, saying that the defendant was dressed like a "security guard or a policeman."
>
> The defendant's wife, Schnell, testified that the defendant and Gillam were at home the night of the crime watching television and that they left at 10:00 p.m. and returned at 10:30 p.m. The defendant came upstairs and asked whether Gillam could borrow the car, and she told him that the decision was up to him. At 12:00 p.m., she went downstairs and took the baby upstairs to bed. She claims that the defendant came upstairs five minutes later. At 5:00 a.m., the defendant received a telephone call and told her that he had to go to his grandmother's house in Wisner, Louisiana [FN]. He asked to her to call Officer Howard and tell him he would not be at work at the Jazz Fest that day. She asked her cousin to call Officer Howard because she was busy. She next saw the defendant Sunday evening. On cross examination, she identified the gun as belonging to the defendant.
>
>> [FN] Wisner is in north Louisiana, near Monroe.
>
> The defendant testified that on the night of the incident he was home with Gillam when Gillam received a call from his neighbor telling him that she heard some noises coming from the apartment that Gillam shared with their mother. He and Gillam went to the apartment where they found the door locked and nothing stolen. They returned to the defendant's house. En route, Gillam asked to borrow the defendant's car, to which the defendant reluctantly agreed. At 5:00 a.m., the defendant received a call from his uncle telling him that his grandmother had had a stroke, so the defendant drove to Wisner to check on her. He told his wife to "beep" Officer Howard. He returned at 8:00 p.m. that night and immediately took his car to the body shop. Sunday morning his wife dropped him off at the Jazz Fest. On cross, he testified that he had forgotten his gun in the car, and that he used a mixture of Hydroshock and Black Talon ammunition.[20]

---

[20] State v. Williams, No. 98-KA-0174, at pp. 2-7 (La. App. 4th Cir. Dec. 1, 1999) (unpublished); State Rec., Vol. VII of XIII.

Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective.[21] In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. See <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See <u>Strickland</u>, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable

---

[21] Presented as two separate claims by petitioner, the claims will be discussed together for ease of analysis.

probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In the instant case, petitioner claims that his counsel was ineffective in failing to pursue a ruling on his motion to suppress petitioner's identification and in failing to object to the identification at trial. Prior to trial, petitioner's counsel filed a motion to suppress the identification.[22] Apparently, hearings were held on that motion on November 18, 1994,[23] and March

---

[22] State Rec., Vol. V of XIII.

[23] State Rec., Vol. VIII of XIII, minute entry dated November 18, 1994.

6, 1995;[24] however, the record does not reflect that the trial court ever actually ruled on the motion. When petitioner raised his ineffective assistance of counsel claim during the post-conviction proceedings, an evidentiary hearing was held. At that hearing, the trial judge rejected the claim, holding that, although the record did not indicate that there was a ruling on the motion to suppress, he would have denied the motion because it was his opinion that there was no basis for suppressing the identification.[25]

This Court finds that petitioner is not entitled to relief because he has failed to establish that the identification procedure was in any way suggestive. The United States Fifth Circuit Court of Appeals has noted:

> [T]he admissibility of identification evidence is governed by a two-step analysis. Initially, a determination must be made as to whether the identification procedure was impermissibly suggestive. Next, the court must determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

Herrera v. Collins, 904 F.2d 944, 946 (5th Cir. 1990) (footnote omitted). A court need not address the second step if the first step is not met: "If the identification procedure is not impermissibly suggestive, the inquiry ends." Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997).[26]

---

[24] State Rec., Vol. VIII of XIII, minute entry dated March 6, 1995.

[25] State Rec., Vol. VIII of XIII, transcript of June 5, 2003, p. 49.

[26] If the inquiry proceeds to the second step, the Fifth Circuit has offered the following guidance:

> In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court indicated that "reliability is the linchpin" when examining the totality of the circumstances to "determin[e] the admissibility of identification testimony." Id. at 114, 97 S.Ct. at 2253. Even an impermissibly suggestive identification procedure does not violate due process so long as the identification

Neither the photographs used nor the transcripts of the suppression hearing are before this Court. Nevertheless, even if the Court accepts as true petitioner's factual allegations regarding the photographic lineup, his claims should be rejected for the following reasons.

According to petitioner, the lineup consisted of "face to chest" photographs of six police officers in uniform, with the officers' first and last names appearing on the photographs.[27] The crux of petitioner's claim is whether the officers' names were visible when the lineup was shown to Storey.

At trial, Detectives Marchese and Marino testified that "cellophane and plastic" were used to hide the officers' names from view when the photographs were shown to Storey.[28] However, petitioner contends that no witnesses at either the suppression hearings or the prior trial in this matter ever testified regarding the use of the removable "cellophane and plastic." Petitioner concludes that the witnesses' silence on that issue proves that the names must not have been obscured.

---

possesses sufficient aspects of reliability. The Supreme Court has set forth several factors to be considered when reviewing the reliability of a pre-trial identification. These factors include

> (1) the opportunity of the witness to view the criminal, (2) the witness's degree of attention, (3) the accuracy of the description, (4) the witness's level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself.

Herrera, 904 F.2d at 947.

[27] Rec. Doc. 2, supporting memorandum, p. 13.

[28] Rec. Doc. 2, supporting memorandum, pp. 17-18.

This Court disagrees. Petitioner indicates that, on those prior occasions, the witnesses were *never asked* if the names were obscured during the actual lineup. If not, then their silence on that issue obviously cannot be construed as evidence that the names were visible. Moreover, as noted, on the *only* occasion where witnesses were expressly questioned on the issue, Marchese and Marino both testified under oath that the names were hidden from view during the lineup. Petitioner has never presented any evidence whatsoever, such as an affidavit from Storey or anyone else present at the lineup, to indicate that the names were not obscured as Marchese and Marino testified or were in any way visible. In light of that fact, as well as the fact that he does not argue that the lineup was suggestive in any other respect, the Court finds that petitioner has not demonstrated that the lineup was impermissibly suggestive. Because there is no evidence that the lineup was impermissibly suggestive, the inquiry ends without the necessity of addressing the Manson factors regarding reliability of the identification.[29] Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997).

Because petitioner has failed to demonstrate that the identification procedure was in any way suggestive, he cannot show that either the motion to suppress or a challenge to the identification at trial would have had any merit. Necessarily, then, he cannot meet his burden of proof to show that counsel performed deficiently or that any prejudice resulted from counsel's failure to pursue a formal ruling on the motion to suppress or to challenge the in-court identification based on the lineup. See United States v. Corcoran, 855 F.Supp. 1359, 1368 (E.D.N.Y. 1994), aff'd, 100 F.3d 944 (2nd Cir. 1996).

---

[29] See *supra* note 26.

Accordingly, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, this Court rejects petitioner's claims that his counsel was ineffective.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Weldon P. Williams be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-first day of August, 2006.

*[signature]*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**